# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:17-CR-185** |
| | : | |
| v. | : | **(Chief Judge Conner)** |
| | : | |
| **DONCARLOS URRUTIA,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant DonCarlos Urrutia ("Urrutia") moves to suppress physical evidence and statements that police obtained pursuant to a search of his residence and his subsequent arrest on May 12, 2017. (See Docs. 17, 18, 46). Urrutia argues that both the physical evidence and his statements should be excluded as fruit of the poisonous tree because the officer who searched his residence lacked reasonable suspicion. (See Doc. 18). The court will deny Urrutia's motion.

## I. Findings of Fact[1]

Urrutia resides with his mother at 1908 North Third Street in Harrisburg, Pennsylvania. (See Hr'g Tr. 29:22-30:3, 35:1-3, 58:7-15). He is currently serving a state parole sentence and 1908 North Third Street is his approved parole address. (See id. at 28:24-29:8, 29:22-30:3, 58:5-8; see also Doc. 18 at 1; Doc. 46 ¶¶ 11-12). On May 12, 2017, State Parole Officer Allen Shipley ("Officer Shipley") and Harrisburg

---

[1] The above factual narrative derives from testimonial and documentary evidence presented at the suppression hearing in this matter held on December 28, 2017. (See Doc. 41). As of the date of this opinion, an official transcript of the hearing is not available. The court reporter has provided the court with a rough draft of the transcript of that hearing, and citations thereto are abbreviated throughout as "Hr'g Tr." Pagination of the rough draft may vary from pagination of the official transcript.

City Police Officer Darrin Bates ("Officer Bates")[2] drove to Urrutia's residence at approximately 8:45 p.m. to conduct a parole home visit.[3] (See Hr'g Tr. 30:19-31:6, 51:25-1, 89:21-91:1).

Upon arrival, Officer Shipley told Officer Bates to wait in the vehicle because it was raining. (See id. at 31:14-19, 63:15-18, 91:1-7, 100:5-9). When Officer Shipley reached the front door, he knocked as he always does when conducting home visits. (See id. at 31:18-20, 64:8-13, 65:4-20, 66:1-5, 91:7-9, 91:15-21, 98:4-14). The door had a glass window covered by a sheer white curtain, but it was possible to see through into the home. (See id. at 31:21-24). Officer Shipley knocked on the door several times but did not hear anything. (See id. at 33:3-5, 65:24-25, 66:6-17, 91:7-9). He then looked through the window and saw a single light in the dining room. (See id.

---

[2] Officer Shipley and Officer Bates were assigned to the Harrisburg Street Crimes Unit. (See Hr'g Tr. 30:24-31:1, 54:7-11, 88:20-21). Officer Shipley started supervising Urrutia in April 2016. (See id. at 29:2-11, 30:4-6, 55:3-5). As a member of the Street Crimes Unit, Officer Bates frequently assisted parole officers, including Officer Shipley, with conducting parolee checks. (See id. at 89:7-20).

[3] The factual findings set forth above substantially reflect the testimony of the officers—Officer Shipley and Officer Bates—who participated in the search of Urrutia's residence and his subsequent arrest. Urrutia also testified, contradicting the officers' recollection of several material aspects of events leading up to the search. (See, e.g., Hr'g Tr. 108:9-10, 108:12-16, 108:18-19, 110:6-10, 113:18-114:5, 115:15-18, 120:5-12, 121:19-122:6).

The court finds that the officers recounted events more credibly than Urrutia. This finding rests upon the nature of the witnesses' testimony and upon their demeanor in court. Officer Shipley and Officer Bates testified consistently with one another despite being sequestered. Both officers remembered events with clarity and appeared composed and collected on cross-examination. In contrast, Urrutia's testimony was riddled with inconsistencies. (Compare id. at 108:6-8, with id. at 111:10-19, 112:3-6; id. at 108:9-19, 113:18-114:5 with id. at 112:7-16; id. at 115:5-11 with id. at 108:11-12, 117:4-12; id. at 112:13-14 with id. at 113:11-14). Urrutia's recollection meandered and backtracked, and his demeanor lacked the characteristics of credibility exhibited by the officers. The court has therefore adopted the description of events provided by Officers Shipley and Bates.

2

at 33:5-10, 33:21-24, 64:2-7, 70:5-11, 71:5-7).  He continued to peer through the window and saw a figure walking "in and out" of the dining room and kitchen area. (See id. at 34:5-15, 36:15-37:3, 67:1-68:7, 68:22-69:1, 70:1-11, 71:20-25).  Officer Shipley knocked on the door.  (See id. at 34:16, 91:7-9).  Eventually, the individual asked who was at the door, to which Officer Shipley responded "state parole."  (See id. at 34:17-19, 66:8-10, 72:5-11, 108:19-21, 117:15-17).  At that point, the individual—Urrutia—answered the door.  (See id. at 34:21-23, 37:7-8, 66:6-17, 72:5-11, 108:22).

Officer Shipley asked Urrutia if he could come inside to make the necessary contact for the parole home visit.  (See id. at 37:8-9, 108:24-25).  Urrutia let Officer Shipley into the house and they walked into the living room.  (See id. at 37:8-13, 108:25-109:1, 118:15-17).  Officer Shipley and Urrutia had a "brief conversation," during which Officer Shipley asked Urrutia if anyone else was home.  (See id. at 37:19-20, 109:7-8).  Urrutia responded that his mother was upstairs sleeping.  (Id. at 38:7-10, 109:7-8).  Officer Shipley inquired as to why Urrutia had waited to answer the door and why he had been pacing between the dining room and the kitchen. (See id. at 38:11-13, 75:7-11, 109:9-12).  Officer Shipley also asked Urrutia to take him to the dining room and kitchen and Urrutia complied.  (See id. at 38:13-17, 75:11-15, 109:13-18, 119:5-7, 119:21-120:4).  Officer Shipley looked around both rooms with Urrutia present.  (See id. at 38:16-22, 75:14-15, 78:22-79:4, 109:14-18).  On the way back to the living room with Urrutia, Officer Shipley radioed Officer Bates for assistance.  (See id. at 39:1-3, 40:11-15, 79:5-7, 91:11-14, 101:5-7, 109:19-21).  Officer Bates entered the home, and Officer Shipley introduced him to Urrutia.  (See id. at 91:22-25, 101:8-9, 109:24, 121:7-10).  Officer Shipley then questioned Urrutia again as

3

to why he had been pacing between the two rooms. (See id. at 38:24-25, 92:1-4, 109:25-110:4, 121:16-18).

In light of Urrutia's appearance of confusion by pacing between two rooms, Officer Shipley concluded that he had reasonable suspicion that "crime was afoot," but nonetheless asked for Urrutia's consent before conducting a search of the dining room and kitchen.[4] (See id. at 39:20-40:3, 73:14-19, 80:14-15, 80:25-81:1, 92:4-6, 102:3-5). Specifically, Officer Shipley asked Urrutia if he had an issue with Officer Shipley "looking around" those rooms. (See id. at 40:7-8, 92:4-6). Urrutia responded, "Go ahead, man." (See id. at 40:9-10, 52:1-2, 80:16-17, 92:7-13, 102:3-5).

Officer Shipley conducted a search of the dining room and kitchen while Officer Bates waited in the living room with Urrutia. (See id. at 40:16-24, 81:2-4, 92:14-24, 110:11-15). Urrutia asked Officer Shipley if he was okay and if everything was "all right" while Officer Shipley was conducting his search. (See id. at 43:21-23, 44:11-23, 75:23-76:11, 81:8-10, 110:19-23). During his search of the kitchen, Officer Shipley found a firearm in a plastic bag hanging from a metal rack. (See id. at 42:11-43:9, 81:11-13, 94:2-5).

Officer Shipley returned to the living room and signaled to Officer Bates to arrest Urrutia. (See id. at 43:10-13, 81:16-21, 93:11-17, 110:25-111:3). The officers took Urrutia into custody by asking him to stand and placing him in handcuffs. (See id. at 43:13-19, 93:19-20). Urrutia did not make any statements upon arrest.

---

[4] The court recognizes that given Urrutia's parolee status Officer Shipley needed only reasonable suspicion—rather than probable cause—to search his residence without a warrant. See United States v. Williams, 417 F.3d 373, 376-78 (3d Cir. 2005). In light of the court's conclusion, as discussed further *infra*, that Urrutia consented to the search of his residence, it is unnecessary for the court to determine whether Officer Shipley had reasonable suspicion to justify the search.

4

(See id. at 43:20-24, 44:24-45:2).  After Urrutia was placed in custody, the officers asked Urrutia to sit down and Officer Shipley told Officer Bates that he had found a firearm in the kitchen.  (See id. at 43:25-44:3, 81:24-82:7, 82:10-12, 93:22-23).  Urrutia responded to this information by putting his head down and shaking it back and forth.  (See id. at 44:4-5, 45:2-4, 82:7-9, 82:13-15).

Officer Shipley and Officer Bates radioed for additional assistance, and two other officers arrived at 1908 North Third Street.  (See id. at 45:5-10, 93:23-24).  Officer Bates then took control of the scene.  (See id. at 45:11-13).  Officer Shipley went upstairs to find Urrutia's mother, Denise Thompson ("Ms. Thompson"), and asked her to come downstairs.  (See id. at 45:16-46:13).  Once downstairs, Officer Bates asked Ms. Thompson if she knew anything about the firearm and asked if he could conduct a search of the rest of the home.  (See id. at 46:14-23, 82:18-20, 94:17-22).  Ms. Thompson consented to the search.  (See id. at 46:24-25, 82:18-21).  Officer Bates administered Miranda warnings to both Urrutia and Ms. Thompson.  (See id. at 47:1-4, 82:19, 94:20-95:17, 123:3-7).

Urrutia thereafter asked if he could make a phone call.  (See id. at 47:5-16, 95:18-21, 97:17-19, 123:8-10).  Officer Bates allowed Ms. Thompson to call someone from Urrutia's cell phone while it was on speakerphone.  (See id. at 95:21-10, 123:8-10, 127:2-4).  Urrutia was still inside the house when the call was made.  (See id. at 96:9-12).  Urrutia told the individual on the phone that "my PO caught me with a gun."  (See id. at 96:13-14, 96:23-97:10, 123:11-24, 124:7-9).  When Urrutia was led out of the home, he made a second statement to a woman outside: "my PO caught me with a gun, I'm going to get at least five years."  (See id. at 47:16-20, 50:20-24, 96:15-

5

20, 97:11-16, 127:2-15). Officer Shipley wrote his report of what transpired later that evening. (See id. at 62:15-63:9). He also testified that he independently recalled what happened on the evening of May 12, 2017. (See id. at 64:17-65:3).

## II. Procedural History

On June 7, 2017, a grand jury returned a one-count indictment against Urrutia. (Doc. 1). The indictment charges Urrutia with being a felon in possession of a firearm on or about May 12, 2017 in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e). (Id.) Urrutia pled not guilty to the indictment. (Doc. 13).

Urrutia filed the instant motion to suppress, accompanied by a supporting brief on July 10, 2017, and the government filed its brief in opposition on July 20, 2017. (Docs. 17, 18, 21). The court convened a hearing on the motion on December 28, 2017. (See Doc. 41). At the hearing, Urrutia submitted a supplemental *pro se* brief in support of his motion. (Doc. 46; see also Hr'g Tr. 9:3-7, 9:13-10:10, 17:24-18:9, 18:23-19:6). The motion is fully briefed and ripe for disposition.

## III. Discussion

Urrutia raises two arguments in support of his motion to suppress. *First*, Urrutia contends that the warrantless search of his home was unlawful because he did not consent to the search and Officer Shipley lacked "reasonable suspicion." *Second*, he avers that all evidence, including the gun and the statements made to third parties after his arrest, should be suppressed as "fruit of the poisonous tree." The court will address these arguments *seriatim*.

6

### A. Warrantless Search

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. AMEND. IV; Horton v. California, 496 U.S. 128, 133 (1990). Subject to narrow and limited exceptions, a search without a warrant is unreasonable. See Kyllo v. United States, 533 U.S. 27, 31 (2001); see also United States v. Whitted, 541 F.3d 480, 484 (3d Cir. 2008). The government bears the burden of demonstrating by a preponderance of the evidence that an exception to the Fourth Amendment's warrant requirement existed at the time of the search. See Vale v. Louisiana, 399 U.S. 30, 34 (1970); United States v. Donahue, 764 F.3d 293, 300 (3d Cir. 2014).

Neither a warrant nor probable cause is required to search an area when the party in control of that area gives consent to search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Prince, 558 F.3d 270, 277 (3d Cir. 2009). Co-inhabitants have the authority to consent to a search, regardless of whether they have an ownership interest in the property. See United States v. Matlock, 415 U.S. 164, 169-72 & n.7 (1974); see also United States v. Stabile, 633 F.3d 219, 230-31 (3d Cir. 2011). The burden is on the government to prove consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Consent coerced by threats or force is not voluntary, but there is no requirement that the individual giving consent be aware of his right to refuse consent, or that officials inform the individual of his right to do so. Schneckloth, 412 U.S. at 229-30, 231; United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005).

Voluntariness determinations are to be based on the totality of the circumstances. Schneckloth, 412 U.S. at 227. To determine whether confessions are voluntary, courts must consider, *inter alia*, "the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged." United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994); see also United States *ex rel.* Harris v. Hendricks, 423 F.2d 1096, 1099 (3d Cir. 1970). Courts may also take into account any verbal or non-verbal interactions between the parties as well as the setting where the consent was obtained. See United States v. Williams, No. 1:14-CR-239, 2015 WL 179044, at *4 (M.D. Pa. Jan. 14, 2015) (citing United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). No one factor is dispositive or controlling. Kim, 27 F.3d at 955.

Urrutia had authority to consent to a search of 1908 North Third Street because he was a resident of the home. The testimony of Officers Shipley and Bates established that he so consented. Officer Shipley asked Urrutia if he could look around the dining room and kitchen area, and Urrutia responded "Go ahead, man." There is no evidence to suggest that Officer Shipley used anything other than a conversational tone, and there is no record that Urrutia's age, intelligence, or educational background rendered his consent involuntary. See Schneckloth, 412 U.S. at 227. Based on the totality of the circumstances, the court finds that Urrutia gave his consent to search the dining room and kitchen area of his residence voluntarily. No independent basis for the search was required.

**B.      Evidence Seized and Statements Made After Search**

Subject to a number of exceptions, the exclusionary rule "mandates that evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'"  United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).  The exclusionary rule applies only when the evidence derives directly from the constitutional violation.  Wong Sun, 371 U.S. at 487-88.  In other words, a defendant must demonstrate a casual "but for" connection between the challenged evidence and the constitutional violation.  United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2006).  Urrutia does not challenge the voluntariness of his statements made to third parties after Officer Bates provided Miranda warnings.  (See Hr'g Tr. 123:3-124:9, 127:2-15).  In light of our conclusion that Urrutia consented to the search of his residence, Urrutia cannot invoke the exclusionary rule.  The gun, and his statements to third parties after the search and his arrest, were lawfully obtained.

**IV.    Conclusion**

The court will deny Urrutia's motion (Doc. 17) to suppress physical evidence and statements.  An appropriate order shall issue.

> /S/ CHRISTOPHER C. CONNER
> Christopher C. Conner, Chief Judge
> United States District Court
> Middle District of Pennsylvania

Dated:     January 23, 2018